ROBBINS GELLER RUDMAN
& DOWD LLP
AELISH M. BAIG (201279)
TAEVA C. SHEFLER (291637)
SNEHEE KHANDESHI (342654)
HAILEY S. ZANUTTO (358143)
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
aelishb@rgrdlaw.com
tshefler@rgrdlaw.com
skhandeshi@rgrdlaw.com
hzanutto@rgrdlaw.com

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | MDL Case No. 4:22-md-03047-YGR |
| This Document Relates To: LOS ANGELES UNIFIED SCHOOL DISTRICT, Plaintiff, vs. META PLATFORMS, INC., et al., Defendants. | Case No.: 4:26-cv-02463-YGR |

PLAINTIFF LAUSD'S OPPOSITION TO DEFENDANT X CORP.'S MOTION TO SEVER AND TRANSFER TO THE NORTHERN DISTRICT OF TEXAS PURSUANT TO 28 U.S.C. §1404(a) AND FED. R. CIV. P. 21

## TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 1

II. PROCEDURAL AND FACTUAL BACKGROUND ..... 1

III. ARGUMENT ..... 4

A. LAUSD's Case Against X Corp. Is Properly Part of the MDL and Should Not Be Severed and Transferred ..... 4

B. The Factors Under Rule 21 and 28 U.S.C. §1404(a) Weigh Against Severance and Transfer ..... 7

1. Plaintiff's Choice of Forum Weighs Against Transfer ..... 8

2. The Unique Expertise of California Courts in Applying the Robust Protections of California Law Weigh Against Transfer ..... 9

3. The Parties' Contacts with the Forum and Local Interest Weigh Against Transfer ..... 11

4. The Convenience of Witnesses and Cost of Litigation Weigh Against Transfer ..... 12

C. X Corp.'s Forum-Selection/Choice of Law Clause Is Not Dispositive and Does Not Warrant Severance or Transfer ..... 12

1. X Corp.'s Forum-Selection Clause Is Not a Valid and Enforceable Agreement ..... 14

a. Record Evidence Does Not Support a Finding of Reasonably Conspicuous Notice ..... 16

b. Record Evidence Does Not Support a Finding of Unambiguous Assent ..... 19

c. Record Evidence Does Not Support a Finding that the Unidentified LAUSD Individual that Purportedly Accepted the Terms Had Authority to Bind LAUSD or Waive LAUSD's Legal Protections ..... 20

2. The Forum-Selection Clause is Unconscionable ..... 21

D. The Motion to Stay Should Be Denied and the Case Should Proceed as Part of the Orderly Case Management of This MDL ..... 22

IV. CONCLUSION ..... 23

# TABLE OF AUTHORITIES


**Page**

**CASES**

*Agence France Presse v. Morel*,
769 F. Supp. 2d 295 (S.D.N.Y. 2011)....................17

*Allen v. Scribner*,
812 F.2d 426 (9th Cir.), *amended*, 828 F.2d 1445 (9th Cir. 1987)....................9

*Alvarez v. T-Mobile USA, Inc.*,
822 F. Supp. 2d 1081 (E.D. Cal. 2011)....................20, 21

*Am. Online, Inc. v. Super. Ct. of Alameda Cnty.*,
90 Cal. App. 4th 1 (2001)....................9

*Atl. Marine Const. Co, Inc. v. U.S. Dist. Ct. for W.D. Tex.*,
571 U.S. 49 (2013)....................7

*Baxter Bailey & Assocs., Inc. v. Niagara Bottling, LLC*,
2025 WL 1543602 (C.D. Cal. May 5, 2025)....................7

*Bayol v. Zipcar, Inc.*,
2014 WL 4793935 (N.D. Cal. Sep. 25, 2014)....................9

*Berman v. Freedom Fin. Network, LLC*,
2020 WL 5210912 (N.D. Cal. Sep. 1, 2020), *aff'd*, 30 F.4th 849 (9th Cir. 2022)....................16

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849 (9th Cir. 2022).................... *passim*

*Chabolla v. ClassPass Inc.*,
129 F.4th 1147 (9th Cir. 2025)....................14, 15, 17

*Chabolla v. ClassPass Inc.*,
2023 WL 4544598 (N.D. Cal. June 22, 2023), *aff'd*, 129 F.4th 1147 (9th Cir. 2025)....................15

*Comb v. PayPal, Inc.*,
218 F. Supp. 2d 1165 (N.D. Cal. 2002)....................22

*Commodity Futures Trading Comm'n v. Savage*,
611 F.2d 270 (9th Cir. 1979)....................8

*Cont'l Grain Co. v. The FBL-585*,
364 U.S. 19 (1960)....................9

*Couvrette v. Couvrette*,
2013 WL 2898531 (S.D. Cal. June 13, 2013)....................12

**Page**

*Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834 (9th Cir. 1986) ....8

*Doe 1 v. AOL LLC*, 552 F.3d 1077 (9th Cir. 2009) ....9, 21

*Doe v. X Corp.*, 2025 WL 3500543 (N.D. Cal. Nov. 6, 2025) ....15

*El Camino Cmty. Coll. Dist. v. Super. Ct. of L.A. Cnty.*, 173 Cal. App. 3d 606 (1985) ....20

*Eliza Labs, Inc. v. X Corp.*, 2025 WL 3003766 (N.D. Cal. Oct. 27, 2025) ....15

*Finjan, Inc. v. Sophos Inc.*, 2014 WL 2854490 (N.D. Cal. June 20, 2014) ....7

*Franey v. Am. Battery Sols. Inc.*, 2022 WL 4280638 (N.D. Cal. Sep. 15, 2022) ....8

*Frigate Ltd. v. Damia*, 2007 WL 127996 (N.D. Cal. Jan. 12, 2007) ....13

*Garcia v. Sizzling Platter, LLC*, 2026 WL 504335 (S.D. Cal. Feb. 23, 2026) ....18

*Godun v. JustAnswer LLC*, 135 F.4th 699 (9th Cir. 2025) ....16, 19

*Heckman v. Live Nation Ent., Inc.*, 120 F.4th 670 (9th Cir. 2024) ....18, 22

*Hendricks v. StarKist Co.*, 2014 WL 1245880 (N.D. Cal. Mar. 25, 2014) ....7

*In re Class Action Settlement Admin. Litig.*, 812 F. Supp. 3d 1359 (J.P.M.L. 2025) ....6

*In re Facebook Biometric Info. Priv. Litig.*, 185 F. Supp. 3d 1155 (N.D. Cal. 2016) ....14

*In re Ferrero Litig.*, 768 F. Supp. 2d 1074 (S.D. Cal. 2011) ....9

**Page**

*In re Park W. Galleries, Inc., Mktg. & Sales Pracs. Litig.*,
655 F. Supp. 2d 1378 (J.P.M.L. 2009)....13

*In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*,
460 F.3d 1217 (9th Cir. 2006) ....4, 5

*In re Plumbing Fixture Cases*,
298 F. Supp. 484 (J.P.M.L. 1968)....5

*In re Roblox Corp. Child Sexual Exploitation & Assault Litig.*,
MDL No. 3166, Statement of Interested Parties Pursuant to
28 U.S.C. §1407 (Nov. 26, 2025) ....2, 4, 5, 13

*In re Rolls Royce Corp.*,
775 F.3d 671 (5th Cir. 2014) ....13

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
2014 WL 1477748 (N.D. Cal. Apr. 14, 2014) ....13

*In re Uber Techs., Inc., Passenger Sexual Assault Litig.*,
734 F. Supp. 3d 934 (N.D. Cal. 2024) ....13

*Incorp Servs. Inc. v. Incsmart.Biz Inc.*,
2012 WL 3685994 (N.D. Cal. Aug. 24, 2012) ....8

*Johnson v. Monterey Fish Co., Inc.*,
2018 WL 2387849 (N.D. Cal. May 25, 2018)....22

*Jones v. GNC Franchising Inc.*,
211 F.3d 495 (9th Cir. 2000) ....7

*Kaur v. U.S. Airways, Inc.*,
2013 WL 1891391 (N.D. Cal. May 6, 2013)....8

*Keebaugh v. Warner Bros. Ent. Inc.*,
100 F.4th 1005 (9th Cir. 2024) ....14

*Landis v. N. Am. Co.*,
299 U.S. 248 (1936)....23

*Lee v. Plex, Inc.*,
773 F. Supp. 3d 755 (2025) ....19

*Leonel v. Am. Airlines, Inc.*,
400 F.3d 702 (9th Cir. 2005) ....10

**Page**


*Lockyer v. Mirant Corp.*,
398 F.3d 1098 (9th Cir. 2005) ....................23

*McGill v. Citibank, N.A.*,
393 P.3d 85 (Cal. 5th 2017) ....................10

*Nagrampa v. MailCoups, Inc.*,
469 F.3d 1257 (9th Cir. 2006) ....................22

*Net Global Mktg. v. Dialtone, Inc.*,
217 Fed. Appx. 598 (9th Cir. 2007) ....................22

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) ....................14, 20

*Oatridge v. Future Motion, Inc.*,
2023 WL 7174225 (N.D. Cal. Oct. 30, 2023) ....................22

*Oberstein v. Live Nation Ent., Inc.*,
60 F.4th 505 (9th Cir. 2023) ....................14

*R. Griggs Grp. Ltd. v. Consolidated Shoe, Inc.*,
1999 WL 226211 (N.D. Cal. Apr. 9, 1999) ....................7

*Rafton v. Rydex Series Funds*,
2010 WL 2629579 (N.D. Cal. June 29, 2010) ....................11

*Robert Bosch Healthcare Sys., Inc. v. Cardiocom, LLC*,
2014 WL 2702894 (N.D. Cal. June 13, 2014) ....................7

*Saleh v. Titan Corp.*,
361 F. Supp. 2d 1152 (S.D. Cal. 2005) ....................12

*Sarinana v. DS Waters of Am., Inc.*,
2013 WL 3456687 (N.D. Cal. July 9, 2013) ....................8

*Shannon–Vail Five Inc. v. Bunch*,
270 F.3d 1207 (9th Cir. 2001) ....................9

*State of Utah v. Am. Pipe & Const. Co.*,
316 F. Supp. 837 (C.D. Cal. 1970) ....................5

*Tech. Credit Corp. v. N.J. Christian Acad., Inc.*,
307 F. Supp. 3d 993 (N.D. Cal. 2018) ....................11

**Page**

*Texas v. Am. Tobacco Co.*,
14 F. Supp. 2d 956 (E.D. Tex. 1997) ........ 10

*Trans-Tec Asia v. M/V Harmony Container*,
435 F. Supp. 2d 1015 (C.D. Cal. 2005), *aff'd*, 518 F.3d 1120 (9th Cir. 2008) ........ 19

*Trend Micro Inc. v. RPost Holdings, Inc.*,
2014 WL 1365491 (N.D. Cal. Apr. 7, 2014) ........ 8

*Trupia v. X Corp.*,
2026 WL 381823 (N.D. Cal. Feb. 11, 2026) ........ 15

*United States v. Torres*,
794 F.3d 1053 (9th Cir. 2015) ........ 21

*Valspar Corp. v. E.I. DuPont de Nemours & Co.*,
15 F. Supp. 3d 928 (D. Minn. 2014) ........ 7

*Verdugo v. Alliantgroup, L.P.*,
237 Cal. App. 4th 141 (2015) ........ 9

*VS Techs., LLC v. Twitter, Inc.*,
2011 WL 11074291 (E.D. Va. June 28, 2011) ........ 17

*Williams v. X Corp.*,
2025 WL 2801626 (S.D. Ala. Oct. 1, 2025) ........ 15

*Zoho Corp. Pvt. Ltd. v. Orion Labs Tech, LLC*,
2026 WL 816229 (N.D. Cal. Mar. 24, 2026) ........ 11

**STATUTES, RULES, AND REGULATIONS**

18 U.S.C.
§1961 ........ 2

28 U.S.C.
§1404(a) ........ *passim*

California Business and Professions Code
§17200 ........ 2
§17203 ........ 10

California Civil Code
§1670.5(a) ........ 22

**Page**

California Education Code
§17604 .......... 20

Texas Business and Commerce Code
§17.45(4) .......... 10
§17.46 .......... 10
§17.50 .......... 10

Federal Rules of Civil Procedure
Rule 21 .......... 1, 4, 7, 12

## I. INTRODUCTION

As the nation's second-largest school district serving nearly 400,000 students, the Los Angeles Unified School District ("LAUSD" or "Plaintiff") is entitled to the full protections of California law to hold X Corp.[1] accountable for the severe harm inflicted on Plaintiff and its youth. X Corp. is appropriately named as a defendant in this multidistrict litigation ("MDL") and should not be severed from the proceeding. In a multi-defendant action such as this, severance would force LAUSD to litigate substantially similar claims against multiple defendants across multiple jurisdictions. Such fragmentation would severely undermine judicial efficiency, risk inconsistent rulings, and waste the limited resources of the courts and LAUSD. California jurisdiction is proper because X Corp.'s misconduct occurred primarily within the state. X Corp. was headquartered in California during much of the alleged wrongdoing, and the majority of its workforce remains based here. Moreover, the push-button contract of adhesion on which X Corp. relies, requires transfer to federal courts in Tarrant or Wichita Counties, Texas, where ***no*** parties reside. The law of venue transfer prioritizes convenience and justice and disallows strategic forum shopping. Regardless, by X Corp.'s own express terms, that forum-selection clause does not apply to local government entities such as LAUSD. Accordingly, LAUSD requests that X Corp's Motion to Sever and Transfer to the Northern District of Texas Pursuant to 28 U.S.C. §1404(a) and Fed. R. Civ. P. 21 ("Motion" or "Mot.") be denied.

## II. PROCEDURAL AND FACTUAL BACKGROUND

In creating this MDL, the Judicial Panel on Multidistrict Litigation ("JPML" or "Panel") aimed to consolidate cases with common factual questions, namely, allegations that "social media platforms" are "defective," "designed to maximize user screen time," "encourage addictive behavior in adolescents," "fail to verify users' ages," "encourage adolescents to bypass parental controls" and "inadequately safeguard against harmful content and/or intentionally amplify harmful and exploitive content." *In re Social Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.*, No. 4:22-md-03047, Transfer Order at 2 (Oct. 6, 2022) ("Transfer Order"). The Panel found that

[1] As used herein, the term "X Corp." shall mean and include X Corp. itself, as well as any and all parents and subsidiaries.

"[c]entralization" would "eliminate duplicative discovery" and "prevent inconsistent pretrial rulings." *Id*. The Panel did not restrict this MDL to certain defendants but expressly acknowledged the "potential for each case to later involve additional platforms" as "some plaintiffs may add defendants," noting that "causation issues" among different social media companies "will overlap" and "all defendants likely will assert the same defenses." As such, the Panel found "[c]entralization will . . . conserve the resources of the parties, their counsel, and the judiciary." *Id.*

On March 20, 2026, LAUSD filed a Short-Form Complaint[2] adopting the master school-district complaint and naming seven social media companies as defendants including Meta, YouTube, Snapchat, TikTok, Discord, Roblox[3] and X Corp. (f/k/a Twitter) asserting Negligence, Public Nuisance, Unfair Competition Law ("UCL") (Cal. Bus. & Prof. Code §17200), RICO,[4] and Gross Negligence claims against all seven defendants.[5] LAUSD set forth the egregious nature of social media-related harm to its students including, *inter alia*, pervasive social media addiction (¶19), anxiety and depression (¶79), more than 8,000 annual incidents of suicidal behavior (¶78), "sick and depraved" cybercrimes (¶80), shooting and bombing threats (¶81, n.80), and sex

---

[2] *In re Social Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.*, No. 4:26-cv-02643, ECF 1. ("Short-Form Complaint"). All "¶_" and "¶¶_" references are to the Short-Form Complaint unless otherwise noted.

[3] As this Court is aware numerous cases against Discord and Roblox are currently stayed in this MDL. LAUSD's counsel Robbins Geller Rudman & Dowd LLP alerted the JPML to various school district and local government Discord and Roblox cases filed and currently stayed in this MDL in advance of, and at, the JPML hearing on December 4, 2025. *See In re Roblox Corp. Child Sexual Exploitation & Assault Litig.*, MDL No. 3166, Statement of Interested Parties Pursuant to 28 U.S.C. §1407, (Nov. 26, 2025). Despite having explicit notice of these local government/school district cases against Roblox and Discord, the JPML did not transfer them out of this MDL and into the new MDLs established for what appear to be mostly personal injury cases against those defendants. *In re: Roblox Corp. Child Sexual Exploitation & Assault Litig.*, MDL No. 3166, Transfer Order (Dec. 12, 2025), ECF 98.

[4] Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. 1961, *et seq.*, ("RICO").

[5] Specifically, LAUSD filed a Short Form Complaint, adopting the Master School District Complaint (ECF 504) asserting Negligence and Public Nuisance claims against Meta, Snap, TikTok, and YouTube, along with Exhibit A, "Supporting Allegations Regarding Short Form Complaint and Demand for Jury Trial" adding additional claims – UCL, RICO, and Gross Negligence) and additional defendants (Discord, Roblox, and X Corp.). All five claims are alleged against all seven defendants.

trafficking (¶57),[6] all of which divert enormous resources from LAUSD's core mission – to educate its students.

As to X Corp., LAUSD alleges that more than 23% of U.S. teens and 30% of 7 to 9 year olds report using the platform (¶52) and that it is designed, like the other defendant social media platforms, in ways that are dangerous and harmful to youth:

> These dangerous and harmful design features include, but are not limited to, failure to implement robust age verification processes to determine users' ages; failure to implement effective parental controls; failure to implement effective parental notifications; failure to implement opt-in restrictions to the length and frequency of use sessions; failure to enable default protective limits to the length and frequency of use sessions; creating barriers that make it more difficult for users to delete and/or deactivate their accounts than to create them in the first instance; failure to label content that has been edited, such as by applying a filter; making filters available to users so they can, among other things, manipulate their appearance; failure to create adequate processes for users to report suspected Child Sexual Abuse Material ("CSAM"); and integrating with social media platforms engaged in automated attention farming through non-neutral algorithms and recommendations fueled by data about user interactions as well as other features that promote addictive and excessive use.

¶12.

This Court has already conducted an in-depth review and issued comprehensive orders on markedly similar allegations brought by school districts against defendants Meta, YouTube, Snap, and TikTok[7] and the key defenses asserted thereby (*i.e.*, Section 230, First Amendment, derivative injury, and proximate causation), at the pre-trial stages of litigation for similar sets of allegations.[8]

---

[6] *See also* Press Release, U.S. Attorney's Office C.D. Cal., *11 Charged in Federal Indictment Alleging Extensive Sex Trafficking of Minors and Young Women Along South L.A.'s Figueroa Corridor* (Aug. 13, 2025), https://www.justice.gov/usao-cdca/pr/11-charged-federal-indictment-alleging-extensive-sex-trafficking-minors-and-young.

[7] Cases against Discord and Roblox have also been filed and were stayed by this Court to allow the cases against Meta, YouTube, Snap and TikTok to proceed first. *See In re Social Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.*, No. 4:22-md-03047, Order Granting Stipulation Staying All Claims and Proceedings Against Discord Inc. and Roblox Corporation, Nov. 18, 2024. Other cases against X Corp. have also been filed. *See, e.g.*, *In re Social Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.*, No. 4:23-cv-01149, ECF 36; *In re Social Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.*, No. 4:26-cv-06077, ECF 1.

[8] *See In re Social Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.*, No. 4:22-md-03047, Order Granting in Part and Denying in Part Rule 702 Motions to Exclude Plaintiffs' Experts' General Causation Opinions (Mar. 17, 2026); *see also In re Social Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.*, No. 4:22-md-03047, Order Granting in Part and Denying in Part Defendants' Motion to Dismiss the School District and Local Government Entities'

X Corp., was initially founded as a California company, Twitter, in 2006. According to X Corp., LAUSD created an official account in 2011. Scolari Decl., ¶21.[9] From 2011 through November 2024, X Corp.'s terms of service contained California forum-selection/choice of law provisions. Scolari Decl., ¶11; Rhodes Decl., ¶8.[10] X Corp.'s Version 20, was rolled out by X Corp. on October 16, 2024 (for a November 15, 2024 effective date); Version 21 was rolled out on December 16, 2025 (for a January 15, 2026 effective date) and Version 22 was rolled out on April 10, 2026 (after the filing of LAUSD's complaint).[11] All of these Versions of X Corp.'s Terms of Services expressly exempt certain government entities from the forum-selection/choice of law provisions:

> If you are a federal, state, or local government entity in the United States using the Services in your official capacity and legally unable to accept the controlling law, jurisdiction or venue clauses above, then those clauses do not apply to you. For such U.S. federal government entities, these Terms and any action related thereto will be governed by the laws of the United States of America (without reference to conflict of laws) and, in the absence of federal law and to the extent permitted under federal law, the laws of the State of Texas (excluding choice of law).

## III. ARGUMENT

### A. LAUSD's Case Against X Corp. Is Properly Part of the MDL and Should Not Be Severed and Transferred

Coordinated MDL's under 28 U.S. Code §1407 ensure that multiple related cases "will proceed toward resolution on the merits with less burden and expense overall than were each litigated through pretrial individually." *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 460 F.3d 1217, 1229 (9th Cir. 2006). LAUSD's claims against X Corp. are similar to the school district

---

Master Complaint (Oct. 24, 2024); *In re Social Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.*, No. 4:22-md-03047, Order Denying Motion for Summary Judgment (Feb. 9, 2026).

[9] Declaration of Megan Scolari in Support of X Corp.'s Motion to Sever and Transfer to the Northern District of Texas Pursuant to 28 U.S.C. §1404(a) and Fed. R. Civ. P. 21 (ECF 11-1) ("Scolari Decl.").

[10] Declaration of Matthew Rhodes in Support of Los Angeles Unified School District's Opposition to Defendant X Corp.'s Motion to Sever and Transfer to the Northern District of Texas Pursuant to 28 U.S.C. §1404(A) and Fed. R. Civ. P. 21 filed concurrently herewith ("Rhodes Decl.").

[11] Version 20 is at Scolari Decl., ¶15, Ex. C; Version 21 is at Scolari Decl., ¶18, Ex. F; Version 22 is at Scolari Decl., ¶23, Ex. G.

claims currently pending, for which this Court has already adjudicated core pre-trial issues. LAUSD's Short-Form Complaint adopts the same causes of action against all seven defendants. The claims present common questions of fact – as initially identified by the JPML when establishing this MDL – including whether defendants' social media platforms "encourage addictive behavior, fail to verify users' ages, encourage adolescents to bypass parental controls, and inadequately safeguard against harmful content and/or intentionally amplify harmful and exploitive content." Transfer Order at 2; *see* ¶¶53, 57-59. And, there are common questions raised by the defenses including: (i) whether Section 230 bars school district claims; (ii) whether the First Amendment precludes liability; (iii) whether the claims are barred by the "derivative injury rule" (the notion that claims derivative of third-party harms are not cognizable); and (iv) whether plaintiffs plead sufficient facts to support proximate causation. *See* Order Granting in Part and Denying in Part Defendants' Motion to Dismiss the School District and Local Government Entities' Master Complaint, ECF 1267. Resolving the same issues in different forums wastes judicial and party resources forcing LAUSD to litigate its multi-defendant action in multiple courts, producing the same documents and overlapping experts in different actions and producing California witnesses in a far-away forum. It also creates a substantial risk of inconsistent pretrial rulings on critical issues – the very thing Congress intended to prevent with the consolidation process.[12]

LAUSD's RICO claim against X Corp. further underscores the efficiencies of keeping this entire action in this MDL. ¶¶100-169, 180-221. LAUSD alleges defendants in this MDL, including X Corp., colluded with each other and industry groups, as an enterprise, to effectuate a scheme to target and addict youth to social media by means of direct partnerships, cross-platform integrations, misrepresentations and omissions (¶¶141-144) relating to youth safety. ¶¶100-169. For example, LAUSD alleged X Corp. partnered with Snapchat, Instagram, and Google on cross-platform

[12] *See State of Utah v. Am. Pipe & Const. Co.*, 316 F. Supp. 837, 839 (C.D. Cal. 1970) ("One of the purposes of §1407, as indicated by its language and legislative history was 'to eliminate the potential for conflicting contemporaneous pretrial rulings by coordinate district and appellate courts in multidistrict related civil actions.'"); *see also Phenylpropanolamine (PPA) Prods.*, 460 F.3d at 1230 (quoting *In re Plumbing Fixture Cases*, 298 F. Supp. 484, 495 (J.P.M.L. 1968) (without centralizing procedure of MDL "'conflicting pretrial discovery demands for documents and witnesses' might 'disrupt the functions of the Federal courts,'" creating "'multiplied delay, confusion, conflict, inordinate expense and inefficiency'").

integrations to maximize youth engagement (¶¶104(k)(l)(m)(n)); engaged in affirmative misrepresentations about the safety of their platforms for youth (¶¶141-144); and used industry groups to communicate false messaging to Congress, parents, school districts, and the American public regarding the safety of their platforms for youth users, all while they flooded youth with addictive and otherwise harmful experiences to maximize profits (¶¶185, 191); *see also* ¶¶180-221 *generally*. It is highly inefficient for separate courts to independently evaluate the activities of defendants alleged to be part of the same enterprise. *See In re Class Action Settlement Admin. Litig.*, 812 F. Supp. 3d 1359, 1361 (J.P.M.L. 2025) (centralization of RICO allegations against multiple defendants because "[s]eparating these claims would result in those defendants litigating, and many of the same witnesses testifying, in multiple districts").

X Corp.'s suggestion that the case against them somehow involves only "X-specific facts" (Mot. at 14) is untenable in light of the common questions of fact and law. Moreover, it was previously raised by other defendants and rejected by the JPML. Transfer Order at 3 (finding although "individualized factual issues may arise in each action," such differences do not "negate the efficiencies to be gained by centralization."). The Panel expressed confidence in this Court's ability to address any unique fact issues using separate discovery or motion tracks. *Id*. Nor is LAUSD's case the only case filed against X Corp. in this MDL. *See e.g.*, *In re Social Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.*, No. 4:23-cv-01149, ECF 36; *In re Social Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.*, No. 4:26-cv-06077, ECF 1. Plaintiff's counsel is informed that additional public entities are preparing to file against X Corp. Indeed, a bipartisan coalition of 35 state attorneys general issued a formal demand to X over concerns (also alleged in LAUSD's complaint ¶71) that its Grok chatbot is being heavily abused to create nonconsensual sexual deepfakes and CSAM.[13]

[13] On January 23, 2026, 35 state attorneys general wrote to X Corp. regarding Grok, an AI chatbot, integrated onto the X platform. The attorneys general expressed concern that Grok allows for the production and dissemination of deepfake nonconsensual intimate images of real people, including children, which are available on the X platform. The attorneys general's investigation centers on Grok's alteration of images of children to depict them in minimal clothing and sexual situations, and production of photorealistic images of very young people engaged in sexual activity. The attorneys general demanded X Corp. take action to stop the production of these images, expressing concern

### B. The Factors Under Rule 21 and 28 U.S.C. §1404(a) Weigh Against Severance and Transfer

X Corp. seeks to sever LAUSD's claims pursuant to Rule 21[14] and transfer this case pursuant to 28 U.S.C. §1404(a), which provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. §1404(a).[15] As the moving party, X Corp. "bear[s] the burden of establishing the propriety of a §1404 transfer." *Robert Bosch Healthcare Sys., Inc. v. Cardiocom, LLC*, 2014 WL 2702894, at *3 (N.D. Cal. June 13, 2014) (collecting cases). This burden has been described as a "heavy" one. *See R. Griggs Grp. Ltd. v. Consolidated Shoe, Inc.*, 1999 WL 226211, at *5 (N.D. Cal. Apr. 9, 1999) (collecting cases).

"In the Ninth Circuit, in determining whether the convenience of the parties and witnesses weighs in favor of transfer, courts [consider] various factors including: (1) the plaintiff's choice of forum; (2) the convenience of the witnesses; (3) the ease of access to sources of proof; (4) the respective parties' contacts with the forum; (5) the state that is most familiar with the governing law; and (6) the differences in the costs of litigation between the two forums." *Hendricks v. StarKist Co.*, 2014 WL 1245880, at *2 (N.D. Cal. Mar. 25, 2014) (citing *Jones v. GNC Franchising Inc.*, 211 F.3d 495, 498 (9th Cir. 2000)). To prevail, X Corp. has the burden of demonstrating that "when these [above] factors are applied, the balance of convenience clearly favors transfer." *Finjan, Inc. v.*

---

that X Corp. not only enabled these harms against children, but encouraged such behavior by design, and that X Corp. allegedly used such capabilities as a selling point.

[14] Where severance is to facilitate transfer, and because both Rule 21 and §1404(a) assess factors that deal with the interest of justice and judicial economy, courts can collapse the consideration into one analysis. *Valspar Corp. v. E.I. DuPont de Nemours & Co.*, 15 F. Supp. 3d 928, 931-32 (D. Minn. 2014); *see also Baxter Bailey & Assocs., Inc. v. Niagara Bottling, LLC*, 2025 WL 1543602, at *2 (C.D. Cal. May 5, 2025).

[15] X Corp. asserts that a valid forum-selection clause necessitates a shift from the traditional factors courts apply in a Section 1404(a) transfer analysis pursuant to *Atl. Marine Const. Co,, Inc. v. U.S. Dist. Ct. for W.D. Tex.*, 571 U.S. 49 (2013), but there, the analysis "presupposes a contractually valid forum-selection clause" which does not exist here. *Id.* at 62, n.5. Here, X Corp.'s forum-selection clause is embedded in an unenforceable sign-in wrap agreement that failed to provide reasonably conspicuous notice of the terms and to which LAUSD did not affirmatively or unambiguously manifest its assent. *See infra* §C. Without a valid forum-selection clause, the traditional Section 1404(a) factors control the instant transfer analysis.

*Sophos Inc.*, 2014 WL 2854490, at *3 (N.D. Cal. June 20, 2014) (citing *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 279 (9th Cir. 1979)); *Sarinana v. DS Waters of Am., Inc.*, 2013 WL 3456687, at *2 (N.D. Cal. July 9, 2013) (denying a Section 1404 motion where "[d]efendant has identified no factor that clearly favors transfer"); *Trend Micro Inc. v. RPost Holdings, Inc.*, 2014 WL 1365491, at *5 (N.D. Cal. Apr. 7, 2014) (moving party has burden of showing "the balance of convenience clearly favors transfer"). Here, the balance of factors weighs against transfer and in favor of keeping this action before this Court.

**1. Plaintiff's Choice of Forum Weighs Against Transfer**

As stated in *Kaur v. U.S. Airways, Inc.*, 2013 WL 1891391 (N.D. Cal. May 6, 2013), "[g]enerally, the plaintiff's choice of forum is accorded significant deference." *Id*. at *3. "'The defendant must make a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum.'" *Id*. (quoting *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986)); *see also Incorp Servs. Inc. v. Incsmart.Biz Inc.*, 2012 WL 3685994, at *13 (N.D. Cal. Aug. 24, 2012) ("The plaintiff's choice of forum should not be easily overturned. Courts must treat transfers for convenience as an exceptional tool to be employed sparingly.").

LAUSD chose this Court as its forum because the allegations and claims brought against X Corp. are largely the same as those being litigated by school districts against each of the other defendants in this MDL. *See supra* §III.A. Additionally, Plaintiff is a school district organized and existing under the laws of the State of California. Indeed, LAUSD is the second-largest school district in the country, comprising more than 1,000 schools, 80,000 employees, and hundreds of thousands of students, all of whom reside in California. ¶4.

Here, X Corp. makes no argument about the potential inconvenience it might suffer if it were required to litigate LAUSD's claims in this forum (indeed most of its employees still reside in California). Instead, it relies on an invalid forum-selection/choice of law clause (*see infra* §C) and weak comparison of median case resolution times across different forums (Mot. at 11-12) ignoring the significant pre-trial progress this Court has already made in presiding over similar claims. *See Franey v. Am. Battery Sols. Inc.*, 2022 WL 4280638, at *15 (N.D. Cal. Sep. 15, 2022) ("The relative congestion of the courts in each district is not especially important."). Transferring this "sliver" of a

case (as X Corp. calls it) to a court unfamiliar with the three-year factual, legal, and procedural history of this MDL would severely undermine judicial efficiency. *See supra* §II, III.A; *see also Allen v. Scribner*, 812 F.2d 426, 436 (9th Cir.), *amended*, 828 F.2d 1445 (9th Cir. 1987) (finding transfer would cause delay as the district "court's familiarity with the case after three and one-half years counseled against a change of venue"). *See also Cont'l Grain Co. v. The FBL-585*, 364 U.S. 19, 26 (1960) ("To permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that [Section] 1404(a) was designed to prevent.").

**2. The Unique Expertise of California Courts in Applying the Robust Protections of California Law Weigh Against Transfer**

LAUSD asserts four claims against X Corp. that are governed by California law. ¶¶170-232, Short-Form Complaint at 1. Because California courts are more familiar with and possess unique expertise in interpreting and applying California's robust consumer protection laws, this factor weighs against transfer. *Shannon–Vail Five Inc. v. Bunch*, 270 F.3d 1207, 1210 (9th Cir. 2001) (finding "transferee district court generally must apply the state law that the transferor district court would have applied had the case not been transferred"); *In re Ferrero Litig.*, 768 F. Supp. 2d 1074, 1081 (S.D. Cal. 2011) ("[a] California district court is more familiar with California law than district courts in other states").

Moreover, forum-selection and choice of law provisions are assessed together because they are intertwined in the determination of how, where, and under what rules a dispute will be handled.[16] Courts consistently recognize that California's consumer protection framework provides broad remedies that are absent or less available in other venues. *AOL*, 552 F.3d at 1084 (declining transfer of UCL claim).[17]

[16] *Doe 1 v. AOL LLC*, 552 F.3d 1077, 1084 (9th Cir. 2009) ("the forum selection clause, together with the choice of law provision, effect a waiver of statutory remedies provided by the CLRA in violation of . . . California's 'strong public policy' to 'protect consumers against unfair and deceptive business practices'"); *Bayol v. Zipcar, Inc.*, 2014 WL 4793935 at *2 (N.D. Cal. Sep. 25, 2014) (forum-selection and choice of law "inseparably entwined").

[17] *See also Verdugo v. Alliantgroup, L.P.*, 237 Cal. App. 4th 141 (2015) (declining transfer of California claim to Texas because doing so would erode employee's rights under California law); *Am. Online, Inc. v. Super. Ct. of Alameda Cnty.*, 90 Cal. App. 4th 1, 12 (2001) (declining transfer of

Forcing LAUSD to litigate its claims in Texas, under a significantly more restrictive Texas statutory framework, would strip the District of the uniquely robust protections offered by California consumer protection laws. For example, unlike the Texas Deceptive Trade Practices Act ("DTPA"), the UCL does not require a plaintiff to be a consumer, nor does it require claims to fall within the statute's enumerated deceptive practices, unconscionability, or warranty provisions. Tex. Bus. & Com. Code §§17.45(4), 17.46, 17.50. Moreover, the UCL is broader because it "borrows" violations of other laws and local regulations and treats them as independently actionable unfair competition. *Leonel v. Am. Airlines, Inc.*, 400 F.3d 702, 714 (9th Cir. 2005) (broadly defining "unfair competition" to include violations of other laws.") The UCL, thus, "'permits violations of other laws to be treated as unfair competition that is independently actionable.'" *Id.*[18] Finally, under Texas's DTPA, the statute of limitations is only two years, whereas the UCL provides a four-year statute of limitations.[19] The forum-selection and choice of law provisions are further unenforceable by eliminating plaintiff's right to seek public injunctive relief under the UCL. *See* California Business and Professions Code §17203. Any "provision in *any* contract—even a contract that has no arbitration provision—that purports to waive, in all fora, the statutory right to seek public injunctive relief under the UCL, the CLRA, or the false advertising law is invalid and unenforceable under California law." *McGill v. Citibank, N.A.*, 393 P.3d 85, 94 (Cal. 5th 2017).

---

California consumer claims to Virginia because it would "substantially diminish the rights of California residents in a way that violates our state's public policy").

[18] Here, LAUSD asserts violations of the Consumers Legal Remedies Act and Children's Online Privacy Protections Act, for example, as part of the basis for their UCL claim.

[19] If Texas law is applied, LAUSD may also be deprived of pursuing its public nuisance claim. Public nuisance claims have been recognized as valid against social media companies for the types of harm alleged here by this Court, [order upholding claims for public nuisance Social Media Addiction, *see also Jewel*)], but likely limited under Texas law, *see Texas v. Am. Tobacco Co.*, 14 F. Supp. 2d 956, 973 (E.D. Tex. 1997) (court "unwilling to accept the state's invitation to expand a claim for public nuisance beyond its ground in real property").

### 3. The Parties' Contacts with the Forum and Local Interest Weigh Against Transfer

X Corp. conducts its business globally and, in fact, was headquartered in California for nearly 18 years, from its founding in 2006 through September 2024.[20] Given that the vast majority of X Corp.'s employees were located in the San Francisco Bay Area throughout a significant portion of the relevant time period, most of the challenged conduct occurred within the jurisdiction of this Court.[21] Further, by choosing to target California youth, X Corp. has purposefully availed itself of the protection of the laws of California and opened itself up to the risk of litigation in California. In fact, xAI, the artificial intelligence company that recently acquired X Corp., is currently headquartered in Palo Alto, California, further strengthening X Corp.'s ties to this forum.[22] *See Rafton v. Rydex Series Funds*, 2010 WL 2629579, at *3 (N.D. Cal. June 29, 2010) ("The interests of justice do not favor allowing Defendants, the alleged malfeasors, to evade the consequences of their decision [to market nationwide] and, in so doing, to receive the benefit of their preferred forum."). LAUSD has countless contacts in California, and neither LAUSD nor X Corp. have any contacts with the Northern District of Texas, let alone the specific counties of Wichita and Tarrant, Texas (X Corp.'s 2004 move of its headquarters was to Bastrop, Texas, which is in the Central District of Texas). *See Zoho Corp. Pvt. Ltd. v. Orion Labs Tech, LLC*, 2026 WL 816229, at *13 (N.D. Cal. Mar. 24, 2026) ("For this factor, the court 'ask[s] only if there is an identifiable local interest in the controversy, not whether another forum also has an interest.'") (alteration in original) (citing *Tech. Credit Corp. v. N.J. Christian Acad., Inc.*, 307 F. Supp. 3d 993, 1009 (N.D. Cal. 2018)).

---

[20] Megan Cerullo, *X, formerly Twitter, to shutter its San Francisco headquarters on Sept. 13*, CBS News (Aug. 29, 2024), https://www.cbsnews.com/news/x-twitter-to-shut-san-francisco-headquarters-september-13/.

[21] Kali Hays, *Inside X, fears rise of forced relocation to Texas with new HQ*, Fortune (Sep. 10, 2024), https://fortune.com/2024/09/10/inside-elon-musk-x-san-francisco-fears-of-forced-relocation-texas-hq/.

[22] Lauren Thomas, Berber Jin and Megan Bobrowsky, *Musk Merges His AI Company With X, Claiming Combined Value of $113 Billion*, WSJ (Mar. 28, 2025), https://www.wsj.com/tech/musk-merges-his-ai-company-with-x-claiming-combined-valuation-of-113-billion-4a8f2263

**4. The Convenience of Witnesses and Cost of Litigation Weigh Against Transfer**

"'The relative convenience to the witnesses is often recognized as the most important factor to be considered in ruling on a motion under §1404(a).'" *Saleh v. Titan Corp.*, 361 F. Supp. 2d 1152, 1160 (S.D. Cal. 2005). Here, X Corp. does not argue that proceeding in this forum will cause inconvenience to any potential witness. Indeed, many X Corp. employees reportedly still reside in California.[23] Conversely, LAUSD anticipates significant inconvenience to its many potential witnesses who reside in California. This outweighs any purported inconvenience to X Corp., especially because X Corp. employees can be compelled to appear and is "not a factor that weighs heavily in favor of transfer." *Couvrette v. Couvrette*, 2013 WL 2898531, at *4 (S.D. Cal. June 13, 2013). X Corp. has not met its heavy burden of showing that the convenience of the parties and the interest of justice warrant transferring this case as required by 28 U.S.C. §1404(a).

**C. X Corp.'s Forum-Selection/Choice of Law Clause Is Not Dispositive and Does Not Warrant Severance or Transfer**

X Corp. conveniently omits from its briefing that, even under the terms of the so-called agreement Defendant cites, the forum-selection/choice of law provisions "do not apply" to "local government entit[ies]" using the platform in their "official capacity." *See Infra §II*; Scolari Decl., Ex. C at 16; Ex. F at 17-18; Ex. G at 17-18. As discussed herein and set forth more fully below, LAUSD is a government entity that was "legally unable to accept the controlling law, jurisdiction or venue clauses" referenced by virtue of the push-button notifications sent and because all such agreements would require Board of Education approval which has not occurred. *See Infra* §III.C.1(c); *see generally* §§II-III; Arriaga Decl., ¶6.[24]

---

[23] Katie Burke, *Elon Musk Says 'No Choice' but to Close X's Longtime San Francisco Headquarters*, CoStar (Aug. 6, 2024), https://www.costar.com/article/226804927/elon-musk-says-no-choice-but-to-close-xs-longtime-san-francisco-headquarters ("San Francisco-based X employees are expected to be moved to the Silicon Valley area, either to an existing office the company leases in San Jose or to an engineering-focused hub in nearby Palo Alto . . . .").

[24] Declaration of Mayra Arriaga in Support of Los Angeles Unified School District's Opposition to Defendant X Corp.'s Motion to Sever and Transfer to the Northern District of Texas Pursuant to 28 U.S.C. §1404(A) and Fed. R. Civ. P. 21 filed concurrently herewith ("Arriaga Decl."). *See also Professional Services Contracts User Guide*. LAUSD Precurement Services Division, at 2, https://psd.lausd.net/doc/pca/irfp_process/process_over_bid_limit/user_guide.pdf ("School

Courts have consistently recognized that forum-selection clauses "'do not limit the Panel's authority'" to centralize related actions, where, as here, the action is part of an MDL proceeding governed by 28 U.S.C. §1407. *In re Park W. Galleries, Inc., Mktg. & Sales Pracs. Litig.*, 655 F. Supp. 2d 1378, 1379 (J.P.M.L. 2009). Transferring cases out of the MDL based on forum-selection arguments constitutes nothing more than a wasteful "ping-pong" of cases between districts. *See In re Uber Techs., Inc., Passenger Sexual Assault Litig.*, 734 F. Supp. 3d 934, 957 (N.D. Cal. 2024).[25] Forum-selection agreements are afforded less weight when arising in the context of an MDL because of the likely impact on judicial efficiency. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2014 WL 1477748, at *2 (N.D. Cal. Apr. 14, 2014) (enforcing forum-selection clause in multi-defendant actions contravenes federal policy in favor of "'efficient resolution of controversies'") (quoting *Frigate Ltd. v. Damia*, 2007 WL 127996, at *3 (N.D. Cal. Jan. 12, 2007)).[26]

Moreover, the purported contract formation on which X Corp. relies – a unilaterally imposed push-button notification possibly pressed by a single unidentified LAUSD employee – is not dispositive. There is no showing of mutual assent to a binding contract on behalf of LAUSD by an authorized individual. "Got it" signifies mere acknowledgment of a notification – not binding manifestation of intent to accept patently unfair terms of service governing litigation that has nothing at all to do with LAUSD's X Corp. account.

---

Principals, Office Administrators, heads of Organizations, and/or Senior Staff DO NOT have delegated authority to sign contracts.").

[25] "[A]ny transfer of the cases at this juncture would be largely, if not entirely, pointless. . . . The cases—which all involve the same common issues of fact as the other cases in this MDL—would then be transferred back here by the [JPML Order]. Very little would be accomplished except the expenditure of administrative and judicial resources to ping-pong dozens of cases between districts and have them end up back where they started." *Id.*

[26] Defendants cite a non-controlling Fifth Circuit opinion, *In re Rolls Royce Corp.*, 775 F.3d 671, 679 (5th Cir. 2014), for a transfer analysis they claim applies here pursuant to *Atlantic Marine*. However, the court in *Rolls Royce* noted that "the need – rooted in the valued public interest in judicial economy – to pursue the same claims in a single action in a single court can trump a forum-selection clause," and that "while *Atlantic Marine* may counsel against such consolidation in a marginal case, its independent force is much dissipated in the world of MDL." *Rolls Royce*, 775 F.3d at 679, 682.

### 1. X Corp.'s Forum-Selection Clause Is Not a Valid and Enforceable Agreement

X Corp. points to LAUSD's continued use of X. Corp platform and its purported clicking of the "Got it" button, to argue that LAUSD entered into a binding contract accepting the 20th and 21st versions of X Corp.'s terms of use, which include X Corp.'s preferred forum-selection language. Neither constitute an enforceable online contractual agreement.

When evaluating the enforceability of online push-button agreements, the Ninth Circuit classifies them as (i) browsewrap agreements, (ii) clickwrap (or click-through) agreements, or (iii) sign-in wrap agreements. In a ***browsewrap agreement***, a "'user accepts a website's terms of use merely by browsing the site,' although those terms are not always immediately apparent on the screen." *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1154 (9th Cir. 2025). California courts consistently decline to enforce browsewraps, as users are often left unaware that contractual terms were offered, much less assented to. *Oberstein v. Live Nation Ent., Inc.,* 60 F.4th 505, 513 (9th Cir. 2023). ***Clickwrap agreements*** are those "in which website users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175-76 (9th Cir. 2014). Clickwrap agreements are enforceable if users affirmatively and unambiguously manifest assent to specified terms before accessing or using a given site. *Chabolla*, 129 F.4th at 1154.[27] ***Sign-in wrap agreements*** represent a middle ground between browsewraps and clickwraps: "the website provides a link to terms of use and indicates that some action may bind the user but does not require that the user actually review those terms." *Id.* (citing *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024)). Courts consider the enforceability of sign-in wrap agreements on a case-by-case basis, conducting an analysis into whether notice was conspicuous and assent was unambiguous.

Here, the agreement at issue appears to be an unenforceable sign-in wrap because, according to X Corp., users were provided with a link to terms, not the actual terms, and then needed to take

---

[27] Clickwraps may also be found unenforceable where notice provided by offeror or manifestation of assent by offeree are insufficient as there "is no per se rule of validity or invalidity," for any style of wrap agreement. *In re Facebook Biometric Info. Priv. Litig.*, 185 F. Supp. 3d 1155, 1165 (N.D. Cal. 2016).

some action (clicking "Got it") to bypass that link. They were not required to actually review the terms of service when they created the account, continued to use it, or purportedly clicked "Got it." As this Court held and the Ninth Circuit affirmed in *Chabolla v. ClassPass Inc.*, when the agreement mechanism contains text notice of the terms, those terms are hyperlinked but not incorporated, and users do not have to affirmatively indicate that they have reviewed the terms in order to proceed, that agreement constitutes a sign-in wrap. *Chabolla v. ClassPass Inc.*, 2023 WL 4544598, at *3 (N.D. Cal. June 22, 2023), *aff'd*, 129 F.4th 1147 (9th Cir. 2025). In the Ninth Circuit, a sign-in wrap is only enforceable if: "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022). Here, record evidence does not support that notice was reasonably conspicuous because users were not required to read the terms, the link offered was not prominently featured, and the terms themselves are ambiguous because, among other things, they state they are "not retroactive." Scolari Decl., ¶9.[28] Neither LAUSD's use of X. Corp's platform nor its purported clicking of the "Got it" button constitutes an enforceable sign-in wrap agreement.[29] Nor is there record evidence of unambiguous mutual assent.

---

[28] X Corp.'s cited authority is inapposite. *See Doe v. X Corp.*, 2025 WL 3500543 (N.D. Cal. Nov. 6, 2025) (not a centralized MDL, plaintiff did not dispute assent to terms); *Trupia v. X Corp.*, 2026 WL 381823 (N.D. Cal. Feb. 11, 2026) (not a centralized MDL, plaintiff did not oppose X Corp.'s motion to transfer); *Eliza Labs, Inc. v. X Corp.*, 2025 WL 3003766 (N.D. Cal. Oct. 27, 2025) (not a centralized MDL, pleadings conceded full compliance with terms and conditions in use of paid developer account); *Williams v. X Corp.*, 2025 WL 2801626 (S.D. Ala. Oct. 1, 2025) (not a centralized MDL, pleadings acknowledged plaintiff adhered to X Corp.'s terms of service).

[29] X Corp.'s reference to statements within two Privacy Center posts (*See* Scolari Decl., ¶¶ 13, 17.), only visible after clicking a "Privacy Center" link within the pop-up notification, similarly fail to provide reasonably conspicuous notice or constitute unambiguous assent of updated terms as users were never prompted to click on or view the posts, they were not prominently displayed, and there was no indication that the by clicking "Got it," the updates were unambiguously assented to. *See Berman* 30 F.4th at 857 ("A user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement.").

**a. Record Evidence Does Not Support a Finding of Reasonably Conspicuous Notice**

X Corp.'s visual presentation of terms does not provide reasonably conspicuous notice of its preferred forum-selection clause. Mot. at 2-3; *see Godun v. JustAnswer LLC*, 135 F.4th 699, 709 (9th Cir. 2025) (considering "visual design of the webpages and the context of the transaction" to determine reasonably conspicuous notice).

In *Berman*, this Court found (and the Ninth Circuit affirmed) that a sign-in wrap agreement was not enforceable where the text "'I understand and agree to the Terms & Conditions'" was printed in "tiny gray font considerably smaller than the font used in the surrounding website elements." *Berman*, 30 F.4th at 854, 856. The terms and conditions were hyperlinked, but they were not presented in the typical blue color that signifies a hyperlink, making them insufficiently conspicuous, and the website did not "prompt affirmative assent to this statement." *Berman v. Freedom Fin. Network, LLC*, 2020 WL 5210912, at *3 (N.D. Cal. Sep. 1, 2020), *aff'd*, 30 F.4th 849 (9th Cir. 2022). In *Berman,* even though the webpage in question contained the phrase "I understand and agree to the Terms & Conditions which includes mandatory arbitration and Privacy Policy," (explicitly calling out the term at issue, "mandatory arbitration"), and the terms were hyperlinked within a textual notice, the court found that the small size of the font and its presentation on the webpage did not provide sufficiently conspicuous notice or prompt affirmative assent to the statement presented. *Berman*, 30 F.4th at 854. Here, X Corp.'s forum-selection clause provides even less conspicuous notice than in *Berman* as the disputed term, the forum-selection/choice of law clause, is not explicitly referenced in X Corp.'s push-button notification.

X Corp.'s proffered evidence, the declaration of Megan Scolari, is wholly insufficient to establish conspicuous notice to LAUSD. Ms. Scolari suggests that the terms of service can currently be found at x.com/en/tos/previous but does not speak to how long they have been available there. Scolari Decl., ¶6. She states they have "at all relevant times" (which is unclear) been "prominently linked via blue hyperlinks on X's homepage," but does not state whether that homepage looks the same across all devices. *Id.* It does not. A cursory search of X Corp.'s homepage via iPhone browser, iPhone application, and desktop access, conducted at the time of the writing of this brief,

shows the Terms of Service and Privacy Policy not hyperlinked in blue. Rhodes Decl., ¶3-5, Exs. 1-3.[30] On the homepage accessed via desktop, although X Corp.'s terms are located below the sign-up and sign-in options, the advisal sentence is off-center and in gray font, causing it to be visually subordinate to the large X logo, the "Continue with phone" button, the "Continue with Google" button, the "Continue with Apple button," and the blank box for inputting email or username. Rhodes Decl., ¶3, Ex. 1.[31] The font size, color, placement, and overall visual construction on the sign-in agreement render it visually subordinate relative to the other elements on that screen. Rhodes Decl., ¶3, Ex. 1. *See Chabolla,* 129 F.4th at 1157; ("users are entitled to assume that important provisions—such as those that disclose the existence of proposed contractual terms—will be prominently displayed, not buried in fine print."); *Berman,* 30 F.4th at 857 (design that draws user's attention away from terms not adequate notice). The advisal does not call out the forum-selection/choice of law change in the Terms.

Nor are the Terms of Service themselves conspicuous. The forum-selection language, appearing on page 15 of 29 of the 20th version of the Terms of Service (Scolari Decl., Ex. C), is itself ambiguous because it states both that the new terms apply to "any dispute" and that they "will not be retroactive" and that "[the] laws of the State of Texas, ***excluding its choice of law provisions***, will govern…" Scolari Decl., Ex. C at 15. Thus, X Corp. sought (via push-button notification) to

---

[30] Further, there are three different points of access to X's log-in window: via desktop, via iPhone on web browser, and via iPhone on the X application – none of which provides conspicuous notice of the terms. On the desktop version, the terms are hyperlinked in black. Ex. 1. The web browser version of the X home page does not contain an advisal and the Terms are listed as one of twelve grey hyperlinks in small font at the bottom of the page. Ex. 2. On the web browser version of the iPhone log-in page the terms are hyperlinked in white. *Id.* The terms are not on the home page of the X app at all. Ex. 3. The terms are hyperlinked in grey (not distinguished from the advisal) on the mobile application account creation page. *Id.* The fact that none of these points of access today show the terms in blue hyperlinks, as described in the Scolari Decl., casts significant doubt on X Corp.'s assertions regarding what version of the hyperlinks LAUSD purportedly encountered at any given time.

[31] Assuming *arguendo* that the initial sign-in did constitute a valid agreement, binding LAUSD to X Corp.'s Terms and Conditions, at the time X Corp. claims LAUSD created its X accounts in 2011, the Terms and Conditions likely identified ***this district*** as its preferred forum, as evidenced by legal briefs filed by X Corp. during that period seeking transfer of claims to this district pursuant to such a clause. *See VS Techs., LLC v. Twitter, Inc.,* 2011 WL 11074291, at *4 (E.D. Va. June 28, 2011) (Twitter urging court to transfer case to Northern District of California pursuant to a forum-selection agreement); *Agence France Presse v. Morel,* 769 F. Supp. 2d 295, 303 (S.D.N.Y. 2011) ("Twitter's terms of service are governed by California law"). *See also* Rhodes Decl., ¶¶7-8, Ex. 4-5.

bind users to a Texas-choice-of-law provision, but not all Texas law, just the Texas law that X Corp. prefers. The provision is one-sided. It applies to claims against X Corp. but not by X Corp. Those claims may be brought in "any competent court in the country". Scolari Decl., ¶19; *see also* *Heckman v. Live Nation Ent., Inc.*, 120 F.4th 670, 686 (9th Cir. 2024) ("whether procedures make '[t]he odds ... far more likely' for one side" weighs in favor of finding substantive unconscionability). Moreover, it expressly states that the provisions "do not apply" to certain government entities. Scolari Decl., Ex. C at 16.

Notably, Version 20 requires cases be brought in the "Northern District of Texas or state courts in Tarrant County, Texas." *Id*. Version 21 requires cases be brought in "federal or state courts located in Tarrant County, Texas" and Version 22 requires they be brought in "the federal or state courts located in Wichita County or Tarrant County, Texas." Scolari Decl., ¶18, Ex. F at 17 (Version 21) and ¶23, Ex. G at 17 (Version 22). Thus, X Corp.'s current provision requires venue not only in the Northern District of Texas but in specific counties within the Northern District of Texas, which is highly improper, particularly given reports that all or most of the cases in Wichita County, for example, are routed to a single judge.[32] Under federal law, venue transfer is intended to promote convenience and justice, not to facilitate or tolerate tactical positioning or forum shopping. 28 U.S.C. §1404(a); *see Garcia v. Sizzling Platter, LLC*, 2026 WL 504335, at *3 (S.D. Cal. Feb. 23, 2026) (in evaluating motions to transfer under Section 1404(a), "courts disfavor parties appearing to engage in forum shopping"); Scolari Decl., ¶23, Ex. F at 17 (specifically Tarrant County), Ex. G at 17 (specifying Wichita or Tarrant Counties).

---

[32] Toluwani Osibamowo, *Want to sue X? You'll have to do it in North Texas, according to new terms of service*, Houston Public Media (Nov. 15, 2024), https://www.houstonpublicmedia.org/articles/technology/2024/11/15/506252/want-to-sue-x-youllhave-to-do-it-in-north-texas-according-to-new-terms-of-service/; Pema Levy, *Elon Musk is Directing All X Litigation Toward his Favorite Judge*, MotherJones (Oct. 17, 2024), https://www.motherjones.com/politics/2024/10/elon-musk-texas-judge-reed-oconnor/; Bobby Allyn, *Elon Musk is bringing lawsuits to Texas. A judge with Tesla stock keeps hearing them*, Houston Public Media (Aug. 9, 2024), https://www.houstonpublicmedia.org/npr/2024/08/09/g-s1-16087/elon-musk-is-bringing-lawsuits-to-texas-a-judge-with-tesla-stock-keeps-hearing-them/; Special Order No. 3-310, N.D. Tex., Wichita Falls Division (Nov. 29, 2016), https://www.txnd.uscourts.gov/sites/default/files/orders/03-310.pdf; Special Order No. 3-343, N.D. Tex., Wichita Falls Division (Sep. 14, 2022), https://www.txnd.uscourts.gov/sites/default/files/orders/3-343.pdf.

**b. Record Evidence Does Not Support a Finding of Unambiguous Assent**

LAUSD's purported clicking of the "Got it" button does not bind it to the forum-selection clause. A notice that simply states "'I understand and agree to the Terms and Conditions'" but fails to "'indicate to the user what action would constitute assent'" is insufficient. *Godun*, 135 F.4th at 713. Sign-in wrap agreements are only enforceable when they explicitly notify users that clicking constitutes agreement, such as text stating, "'[b]y clicking the Continue . . . button, you agree to the Terms & Conditions." *Lee v. Plex, Inc.,* 773 F. Supp. 3d 755, 767 n.6 (2025). *See also Berman*, 30 F.4th at 858.

According to X Corp.'s cited evidence, the text preceding the "Got it" button reads: "We're updating our Terms of Service and Privacy Policy. Now's a great chance to review them. If you want to learn more about these changes, head to the X Privacy Center." Scolari Decl., ¶15. ***The only option available to the user is to click "Got it" and dismiss the notification***. *Id*. The notification does not identify what user actions constitute assent. It does not even mention an "agreement." There is no explicit instruction to users that, by clicking "Got it," they were manifesting clear assent to new, changed, material[33] terms. *See Berman* 30 F.4th at 857 ("A user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement."). Clicking the "Got it" button and dismissing the notification does not require users to interact with the terms at all. At most, the phrase "Got it" communicates a dismissal of a notice, not an explicit advisal informing the user that clicking the prompt constitutes unambiguous manifestation of contractual assent. *See* Arriaga Decl., ¶6; *see also Godun*, 135 F.4th at 712-13 (no manifestation of unambiguous assent where "advisal lacked an explanatory phrase indicating that 'By clicking connect now'…[plaintiff] agreed to the terms….instead [advisal] simply said 'I agree'

[33] X Corp. contends the change to its Terms of Service pre-selecting Texas law and specific courts in Tarrant and Wichita Counties, Texas, for litigation of any and all disputes arising, even those that do not pertain to LAUSD's use of the X platform, are "nonmaterial." Scolari Decl., ¶23. They are material to LAUSD and they are material under Ninth Circuit law. *Trans-Tec Asia v. M/V Harmony Container*, 435 F. Supp. 2d 1015, 1025 (C.D. Cal. 2005), *aff'd*, 518 F.3d 1120 (9th Cir. 2008) ("courts have generally found forum-selection clauses to be material alterations").

without explaining more"). X. Corp has failed to establish LAUSD's unambiguous manifestation of assent. *Berman*, 30 F.4th at 856–58; *Nguyen*, 763 F.3d at 1177–79.

**c. Record Evidence Does Not Support a Finding that the Unidentified LAUSD Individual that Purportedly Accepted the Terms Had Authority to Bind LAUSD or Waive LAUSD's Legal Protections**

X Corp. presumes facts that are not in the record. Under California law, the governing board of a school district retains primary contracting authority but may delegate this authority to the superintendent or other designated officials. Cal. Educ. Code §17604 (West); *see supra* note 22. The statute requires that any contract made pursuant to a delegation "shall not be valid or constitute an enforceable obligation against the district unless and until the same shall have been approved or ratified by the governing board." *Id.* California courts have routinely enforced this requirement. *See El Camino Cmty. Coll. Dist. v. Super. Ct. of L.A. Cnty.*, 173 Cal. App. 3d 606 (1985) (finding arbitration agreements signed by vice-presidents of community college unenforceable because school districts are public entities with limited powers and contracts require board ratification to be binding).

X Corp. fails to put forth any evidence showing that the individual(s) who created Plaintiff's X account, or the individual(s) who bypassed push notifications regarding additional or updated terms, had the authority to contractually bind LAUSD. Nor does X Corp. demonstrate that the governing board ratified the purported agreement materially limiting LAUSD's legal rights to pursue claims against X Corp. in a forum of LAUSD's choice. Cal. Educ. Code §17604 (West). At the very least, X Corp. should be required to substantiate this assertion, and Plaintiff should be provided the opportunity to take discovery to refute it. *See Alvarez v. T-Mobile USA, Inc.*, 822 F. Supp. 2d 1081, 1085 (E.D. Cal. 2011) (finding plaintiff entitled to discovery to refute "contested issue" of agreement formation); *see also* Arriaga Decl., ¶¶4-7; *supra* note 22.

Further, X Corp.'s Motion and attached exhibits provide only vague and unsubstantiated claims regarding LAUSD's interaction with the purported advisal notification and assent. *See, e.g.*, Scolari Decl., ¶22. Ms. Scolari attests that LAUSD "specifically accepted Version 21" based on her "review of available data" but fails to identify who at LAUSD did so, or what data confirms this.

Scolari Decl., ¶22. She offers nothing in the way of screenshots, images, or underlying data regarding LAUSD's purported clicking of the "Got it" button.[34] Scolari Decl., ¶¶21-22. She offers nothing to support that an authorized LAUSD official clicked on or reviewed the 20th, 21st, or 22nd versions of the Terms of Service (the last of which was rolled out ***after*** LAUSD filed this action). Scolari Decl., ¶¶21-23. At a minimum, Plaintiff should have the opportunity to take discovery on these factual issues and challenge X Corp.'s unsupported, conclusory, hearsay claims to which Plaintiff objects. *See* Arriaga Decl., ¶¶4-7; *see also Alvarez*, 822 F. Supp. 2d at 1085.[35]

Here, for the reasons set forth above, the record evidence does not support a finding of reasonably conspicuous notice or unambiguous assent by an LAUSD representative authorized to bind LAUSD to a material contract provision that significantly impacts its rights. But, even if this Court were to somehow find the formation of a contract on this record, a forum-selection/choice of law clause is unenforceable where it contravenes a strong public policy, whether declared by statute or by judicial decision. *AOL*, 552 F.3d at 1083; *see supra* III.B.2.

### 2. The Forum-Selection Clause is Unconscionable

X Corp.'s forum-selection clause is an unconscionable contract provision because X Corp. utilizes unequal bargaining positions and the element of surprise in an adhesion contract, and because it is unfairly one-sided in its application of the forum-selection clause against users but not itself. Any enforcement of its terms would improperly disregard California's strong public policy

---

[34] Exhibits A and D are represented to be copies of the prompt served in connection with the Version 20 and Version 21 updates respectively. The screenshots attached in each are mobile screenshots entirely disconnected from LAUSD's specific purported acceptance. Defendant fails to provide record evidence demonstrating that an LAUSD official was in fact using a mobile device when they purportedly accepted, nor does it offer any evidence regarding the presentation of the prompt on a desktop interface. Exhibits B and E provide screenshots of blog posts that a hypothetical user might see in the event they clicked on a hyperlink, which is entirely at their discretion to click on. X Corp. fails to provide evidence that LAUSD clicked on the hyperlink in question at any point.

[35] Specifically, her reliance on "data" for the notion that LAUSD took certain actions renders the data an out-of-court statement offered for the truth of the matter, which is not admissible. *United States v. Torres*, 794 F.3d 1053, 1059 (9th Cir. 2015) ("[A] party is prohibited from introducing a statement made by an out-of-court declarant when it is offered at trial to prove the truth of the matter asserted.")

against unconscionable contract provisions. *See* Cal. Civil Code §1670.5(a) (granting courts broad authority to refuse to enforce unconscionable contracts).

The forum-selection clause is both procedurally and substantively unconscionable. *See Comb v. PayPal, Inc*., 218 F. Supp. 2d 1165, 1172 (N.D. Cal. 2002). It is procedurally unconscionable because it is hidden within a contract of adhesion, buried under the unclear heading "General," in the middle of a paragraph, at the end of a long agreement. *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1293 (9th Cir. 2006) (forum-selection clause deemed unconscionable when part of a contract of adhesion); *Net Global Mktg. v. Dialtone, Inc*., 217 Fed. Appx. 598, 601 (9th Cir. 2007) (finding procedural unconscionability where "[t]here was no 'clear heading' in the Terms of Service that could refute a claim of surprise; to the contrary, the arbitration clause is listed in the midst of a long section without line breaks under the unhelpful heading of 'Miscellaneous'"). It is substantively unconscionable because the provision is one-sided: it preserves X Corp.'s right to bring "any claim" against any X user in "any competent court in the country," while simultaneously restricting all claims against X Corp. to the Northern District of Texas. Scolari Decl., ¶19; *see also Heckman*, at 686 ("whether procedures make '[t]he odds ... far more likely' for one side" weighs in favor of finding substantive unconscionability).

**D. The Motion to Stay Should Be Denied and the Case Should Proceed as Part of the Orderly Case Management of This MDL**

Should X Corp.'s motion to sever and transfer be denied, X Corp. also asks the Court to grant a stay of proceedings. "'In considering whether a stay is appropriate, the Court weighs three factors: (i) the possible damage which may result from the granting of a stay, (ii) the hardship or inequity which a party may suffer in being required to go forward, and (iii) the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay.'" *Oatridge v. Future Motion, Inc.*, 2023 WL 7174225, at *1 (N.D. Cal. Oct. 30, 2023) (citing *Johnson v. Monterey Fish Co., Inc.*, 2018 WL 2387849, at *1 (N.D. Cal. May 25, 2018)).

X Corp. asserts, without support, that a stay will further the interests of judicial economy referencing the Discord/Roblox stay but arguing no hardship or inequity that would justify a stay.

Mot. at 12-13. LAUSD seeks both injunctive relief and monetary damages for its claims against X Corp. ¶221. The injunctive relief sought is intended to prevent future harm to LAUSD and its students and, thus, weighs against a stay. *Id.*; *see Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936); *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1112 (9th Cir. 2005) (prayer for injunctive relief weighed against stay). LAUSD is prejudiced from delay. Evidence grows stale, memories fade and the harm continues unabated. That said, Plaintiff and counsel recognize that the work on the bellwether cases benefits similarly situated cases. We are fully aware of the numerous, complex moving parts inherent in this vast MDL and remain prepared to move forward at a court-deemed appropriate juncture. We will do so in a manner that respects the Court's convenience, availability, and overall case management calendar.

## IV. CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that X Corp.'s Motion be denied in its entirety. Plaintiff respectfully requests that the Court deny the motion to stay and, taking into account the progression of related actions within this MDL, exercise its sound discretion to advance this matter efficiently.

DATED: June 30, 2026

ROBBINS GELLER RUDMAN
& DOWD LLP
AELISH M. BAIG
TAEVA C. SHEFLER
SNEHEE KHANDESHI
HAILEY S. ZANUTTO

*/s/ Aelish M. Baig*
AELISH M. BAIG

One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
aelishb@rgrdlaw.com
tshefler@rgrdlaw.com
skhandeshi@rgrdlaw.com
hzanutto@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
STUART A. DAVIDSON (admitted *pro hac vice*)
NICOLLE B. BRITO
MICHAL-ANE MCINTOSH
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
sdavidson@rgrdlaw.com
nbrito@rgrdlaw.com
mmcintosh@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
THOMAS E. EGLER
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)
tome@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
ANA AVALOS CUELLAR
420 Lexington Avenue, Suite 1832
New York, NY 10170
Telephone: 212/432-5100
aavalos@rgrdlaw.com

Attorneys for Plaintiff